UNITED STATES, Appellee

v.

Dennis MCMAHON, Staff Sergeant
U.S. Army, Appellant

No. 02-0876

Crim. App. No. 9901020

United States Court of Appeals for the Armed Forces

Argued April 9, 2003

Decided June 26, 2003

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE, EFFRON, BAKER, and ERDMANN, JJ., joined.

<u>Counsel</u>

For Appellant:  Captain Kathy Martin (argued);  Colonel Robert D. Teetsel, Lieutenant Colonel E. Allen Chandler, Jr. and Major Imogene M. Jamison (on brief); and Captain Brian Heslin.

For Appellee:  Captain Tami L. Dillahunt (argued); Colonel Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines and Major Mark L. Johnson (on brief).

Military Judges: Nancy A. Higgins and Stephen V. Saynisch.

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.**

Chief Judge CRAWFORD delivered the opinion of the Court.

Pursuant to his pleas, Appellant was convicted of false official statements, larceny of military property of a value greater than $100, and wearing an unauthorized award, in violation of Articles 107, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 907, 921, and 934 (2000). Appellant was sentenced to a bad-conduct discharge, confinement for eight months, total forfeitures, a reprimand, and reduction to pay grade E-1. The convening authority approved the adjudged sentence, and credited Appellant with 24 days of pretrial confinement credit. The Army Court of Criminal Appeals affirmed the findings and sentence in an unpublished per curiam opinion, and we granted review of the following issues:

I.   WHETHER THE MILITARY JUDGE ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE FROM APPELLANT'S HOME AND STORAGE AREA WHERE, UNDER THE TOTALITY OF THE CIRCUMSTANCES, APPELLANT DID NOT VOLUNTARILY CONSENT TO THE SCOPE OF THE SEARCH CONDUCTED.

II.  WHETHER THE MILITARY JUDGE ERRED WHEN SHE FOUND THE GOVERNMENT WOULD HAVE INEVITABLY DISCOVERED THE EVIDENCE STOWED IN APPELLANT'S HOME AND STORAGE AREA.

III. WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION WHEN SHE DENIED APPELLANT'S MOTION TO SUPPRESS EVIDENCE FOUND BY THE CID AGENTS; EVIDENCE WHICH WAS OUTSIDE THE SCOPE OF THE MILITARY MAGISTRATE'S SEARCH AUTHORIZATION.

For the reasons set forth below, we affirm.

FACTS

The military judge made the following findings of fact, on which we rely in rendering our decision:

> At approximately 0427 hours on 5 May 1999, paramedics and an ambulance were sent to 5457 North 7th Street, Davis Hill Quarters Area, Fort Lewis, Washington. Mrs. McMahon called "911" when she found that Ms. Billie R. Etzel, her aunt[,] had apparently died in her sleep on the living room couch. Military police patrols also went to the quarters.

> At approximately 0435 hours on 5 May 1999, Special Agent (SA) Chaffee, United States Army Criminal Investigation Division Command (CID)[,] was called and informed of the death. SA Chaffee was the duty agent. SA Chaffee and SA Hoter [] went to the quarters. They arrived at the quarters between 0500 and 0530 hours.

> Pursuant to CID Regulation 195-1, CID investigates deaths on Army installations, even those involving natural causes, because there is a governmental interest involved.

> The occupants of the government quarters were SSG Dennis McMahon, Mrs. Kathy McMahon, their two children and Ms. Billie R. Etzel, the deceased.

> Upon his arrival, SA Chaffee spoke to the Military Police Duty Officer who was coordinating with SSG McMahon's unit and arranging for lodging for the family. Enroute [sic] to the quarters and while at the quarters, SA Chaffee also coordinated by telephone with his team chief, SA VanAllstyne.

> SA McCarthy was also told to come to the death scene. He stopped at the CID office and picked up equipment before going to the scene.

> . . . .

3

At approximately 0540 hours, SA Hoter interviewed Mrs. McMahon[,] who related that Ms. Etzel[,] her aunt[,] had been living in the quarters for about a month. Ms. Etzel had lost her job and her house. Ms. Etzel's health was declining. She was losing mobility and needed help changing and moving around. Mrs. McMahon and her aunt had argued about her aunt's drinking. Mrs. McMahon had taken a wine bottle from Ms. Etzel. At some point, the agents were told that the wine bottle had been placed in the storage shed.

SA Hoter told Mrs. McMahon that they would need to gather evidence, take measurements, and look around. Mrs. McMahon nodded affirmatively that she understood. SA Hoter did not ask for consent for a search of the house from Mrs. McMahon. Mrs. McMahon was very upset and a decision was made to wait for SSG McMahon. Mrs. McMahon had been told that arrangements were being made for her and her children to leave the house. She was worried about leaving her dog. The interview lasted 15-20 minutes. SA Hoter[] would have asked Mrs. McMahon for consent, if her husband had not returned. Her testimony was credible.

SSG McMahon's unit released him and he returned to his quarters, at an unspecified time prior to 0600 hours, but after the CID agents had arrived on the scene.

At some point, SA McCarthy saw SA Chaffee talk to SSG McMahon. SA Chaffee identified himself to SSG McMahon and told him that they have to conduct an investigation and look through his house for medications that Mrs. Etzel may have taken. SA Chaffee told SSG McMahon that it would take several hours and asked him for permission. SSG McMahon said yes. SA Chaffee was clear that they needed to look in the house. SSG McMahon did not ask any questions. He was calm and concerned about his family. SA Chaffee wanted to get the family out of the quarters and into the Lodge.

SSG McMahon asked SA Chaffee how long they would be gone. The response to this question was a few hours. SSG McMahon told his wife that they would not need to pack a suitcase. Mrs. McMahon stopped packing the suitcase that she had been packing.

4

Inside the quarters, at approximately 0558 hours, SA Hoter introduced herself to SSG McMahon. SSG McMahon admits that SA Hoter spoke to him after he arrived at his quarters[,] that she told him that his aunt was dead, wife was upset, that he could not enter the living room because it was a crime "scene".

SA Hoter spoke to SSG McMahon again before the family left. She explained what CID and the military police would be doing, e.g. taking photographs, measurements, and collecting evidence. SA Hoter asked SSG McMahon would it be okay to look around quarters, and he replied ["]do what you have to do["] or words to that effect. SA Hoter said to SSG McMahon that "foul play" was not suspected, but that [CID] must investigate. She said that when the body was taken away and work done that the family could come back.

SA Hoter also asked them for the keys to the house. SSG McMahon and Mrs. McMahon gave her the keys to the house. SA Hoter told them that they would use the keys to secure the house, when they were finished. SA Hoter asked them if anyone else had keys to the house and SSG McMahon said that the only other keys were in the housing office.

SSG McMahon and his wife had access to all rooms of the house except the living room, at all times during this sequence of events. Further, SSG McMahon went into his yard to check his dog, into the bedroom to check his wife, and spoke to at least five people (SA Hoter, SA Chaffee, MP Duty Officer, SSG MP, and his wife) from the time he arrived at his quarters until he departed.

At approximately 0630 hours, SSG McMahon and his family departed the quarters. At this time, SA McCarthy, SA Hoter and SA Chaffee began inspecting the house.

SA Hoter and SA Chaffee noted the quarters were in disarray, piles of items including military equipment, books, papers, computer items were sitting on furniture and the floor throughout the quarters. The quarters smelled of urine and feces. The floors

were dirty and sticky, as if items had been spilled and not cleaned up.[]

SA Hoter and SA Chaffee began their work in the living room.

SA McCarthy began his work in the kitchen conducting a visual survey and opening cupboards and looking in them.

SA McCarthy wrote down the names of the medicines, which were in a container on the kitchen refrigerator. SA McCarthy went to the master bedroom. He proceeded to go around in a circle looking at the dresser, the desk tops and piles of items in the room. SA McCarthy also opened a closet door in the hallway, which he did not know was a closet at that time.

While working, SA Chaffee observed military sleeping bags and blankets lying on the couch in the living room. SA Chaffee checked a storage shed and observed an inflatable boat with a National Stock Number indicating it was military property in the storage shed. SA McCarthy observed several Windows CD ROMS with tapes and markings indicating that they were property of the U.S. government, a CD ROMS [sic] addressed to a Commander in the master bedroom and a closet in the hallway containing enough military equipment and field gear for eight people.

The equipment in the closet was stacked top to bottom and visible by opening a door. The equipment included containers for night vision goggles, and a large quantity of chemical lights. The inflatable boat was in a shed and was visible when the door of the shed was opened. The CD ROMS were in the open (plain view) sitting on a desktop.

The agents intended to complete their investigation and leave the quarters as quickly as possible. SA Chaffee noted the presence of the inflatable boat as unusual and noted the items SA McCarthy brought to his attention again as unusual. SA Chaffee wanted SA McCarthy to stay focused on the death investigation.

The master bedroom closet contained SSG McMahon's and Mrs. McMahon's clothing on hangers, a box containing SSG McMahon's boots and a cedar chest. The cedar chest was 30 inches high; three ammunition cases were stacked on top the cedar chest. Two cases were stacked on top of each other bringing the combined height of the cedar chest, ammunition boxes to about four feet. The ammo cases are olive green with canary yellow lettering over one inch high on the side.

As SA Chaffee approached the door to leave the room after speaking to SA McCarthy about the CD ROMS, he looked in the open closet door. A box caught his eye, which had another National Stock Number on it. Given all the "military equipment" they had observed, another box caught SA Chaffee's attention. As he approached the closet to look he saw the ammunition boxes. He reached in and pulled out the ammunition boxes. At approximately that time, he exclaimed "what the heck or hell". SA Chaffee was concerned for everyone's safety and opened the boxes. SA Chaffee observed TNT and other explosives in the boxes. He directed everyone to leave the quarters.

After a telephonic briefing on 5 May 1999, Major Kash, a part-time military magistrate[,] authorized a search at 0806 for "items of explosive ordnance and any associated hardware and any items of US government property and TA-50." (AE XXVII) Oral authorization was given to search due to the presence of explosive ordnance. The authorization and affidavit [were] subsequently reduced to writing.

. . . .

During the search for explosives and US government property, SA McCarthy noticed that SSG McMahon had made some certificates on his printer and had a collection of "clip art." SA McCarthy saw a letter, which stated that SSG McMahon was not awarded a Bronze Star. SA McCarthy subsequently opened a notebook/three ring binder on a shelf. The notebook contained a certificate awarding a Bronze Star to SSG McMahon.

At 1715 hours on 5 May 1999, SA Chaffee advised SSG McMahon of his rights under Article 31, UCMJ and a

> Rights Waiver Warning Certificate was prepared and signed. SSG McMahon waived his rights and admitted that he falsified his records to reflect the award of a Bronze Star.
>
> At approximately 1315 hours on, [sic] 6 May 1999, SA Rodriguez briefed Major Kash in person and a second warrant was issued at 1420 hours for "personal home computer equipment to include any storage media, scanner, printer and Class A uniform with associated awards and ribbons; and any other stolen government property."

Before trial, Appellant moved to suppress the evidence seized from his home and storage area on the ground that it was unlawfully obtained. The military judge denied the motion.

### DISCUSSION

Appellant first argues that he did not consent to the special agents' initial search of the home. We disagree. Because we hold that Appellant's consent was valid, we need not address the issue of inevitable discovery.

The military judge ruled that "[t]he evidence establishes that there was consent not mere acquiescence" and that "[u]nder the totality of the circumstances test, voluntary consent was given."

> We review a military judge's evidentiary ruling for abuse of discretion. The military judge's "[findings of fact will not be overturned unless they are clearly erroneous or unsupported by the record." We review conclusions of law de novo. United States v. Reister, 44 MJ 409, 413 (1996). As we said in United States v. Sullivan, 42 MJ 360, 363 (1995), "We will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his

8

decision is influenced by an erroneous view of the law."

United States v. Owens, 51 M.J. 204, 209 (C.A.A.F. 1999). The evidence in the present case clearly supports the military judge's finding that Appellant validly consented to the initial search.

The Fourth Amendment protects the "security of one's privacy against arbitrary intrusion by the police." Schneckloth v. Bustamonte, 412 U.S. 218, 242 (1973)(quoting Wolf v. Colorado, 338 U.S. 25, 27 (1949)). A search of a residence conducted without a warrant based on probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions," one of which is a search conducted with the resident's consent. Id. at 219 (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

Consent is valid only if it is "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). See also Military Rule of Evidence 314(e)(4)[hereinafter M.R.E.]. The determination as to whether consent is voluntarily given "is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. See also United States v. Radvansky, 45 M.J. 226, 229 (C.A.A.F. 1996); M.R.E. 314(e)(4). Considerations include age, intelligence, experience, length of military service, whether

the environment was custodial or coercive, and knowledge of the right to refuse consent.  See United States v. Watson, 423 U.S. 411, 424-25 (1976); Schneckloth, 412 U.S. at 226-27; United States v. Goudy, 32 M.J. 88, 91 (C.M.A. 1991); United States v. Middleton, 10 M.J. 123, 133 (C.M.A. 1981); M.R.E. 314(e)(5). Consent must be more than "acquiescence" to a claim of lawful authority.  Bumper, 391 U.S. at 549; United States v. McClain, 31 M.J. 130, 133 (C.M.A. 1990); M.R.E. 314(e)(4).  The expressed object of the search generally defines the scope of the consent. Florida v. Jimeno, 500 U.S. 248, 251 (1991)(citing United States v. Ross, 456 U.S. 798 (1982)).

The special agents clearly explained to Appellant their intent to search the home for clues to Ms. Etzel's death. Special agent Hoter specifically described her plan to take photographs and measurements and to collect evidence.  Special agent Chaffee was clear that finding medication was the primary objective of their search.  Moreover, Appellant was 34 years old, a husband and father, and an experienced noncommissioned officer with approximately 14 years of active duty service.  The military judge's findings of fact indicate that when Appellant interacted with the special agents, he was calm and did not ask any questions.  After speaking with the special agents, Appellant handed them his keys, gathered his family and some belongings, and departed the home.  It was in this context that

Appellant told the special agents to "do what you have to do," or words to that effect.

In light of the stated purpose of the search, Appellant's demeanor, and his apparent understanding of the special agents' objectives, the military judge did not abuse her discretion in finding Appellant's consent to have been voluntary and valid.

While searching pursuant to Appellant's valid consent, the special agents found items indicative of criminal activity, but unrelated to Ms. Etzel's death and therefore beyond the scope of Appellant's consent. The special agents promptly stopped their search and properly obtained a search authorization from a military magistrate.

Nevertheless, Appellant claims that special agent McCarthy's search of the binder in which the falsified Bronze Star certificate was found exceeded the scope of the magistrate's search authorization. We hold that the magistrate's first search warrant authorized special agent McCarthy's search of the binder. The search authorization was for, among other things, government property, including government CD ROMs. The special agent was justified in opening the binder because it was a place where CD ROMs might reasonably be kept. Once inside the binder, having observed what appeared to be a falsified award certificate, special agent McCarthy was

authorized under the plain view doctrine to seize the certificate therein.

Law enforcement officials conducting a lawful search may seize items in plain view if "[the officials] are acting within the scope of their authority, and . . . they have probable cause to believe the item is contraband or evidence of a crime." United States v. Fogg, 52 M.J. 144, 149 (C.A.A.F. 1999). The touchstone of probable cause is the official's "reasonable ground for belief." United States v. Powell, 7 M.J. 435, 436 (C.M.A. 1979)(quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).

Special agent McCarthy lawfully entered Appellant's bedroom and began searching the binder for government property pursuant to the terms of the first search authorization. Once lawfully searching the binder, special agent McCarthy saw a Bronze Star certificate that appeared -- in light of the clip art, computer-generated certificates, and letter stating that Appellant was not awarded a Bronze Star -- to have been falsified. This discovery gave special agent McCarthy reasonable grounds to believe -- in other words, probable cause -- that the certificate may be evidence of a crime. In short because special agent McCarthy was lawfully searching the binder, and because he had probable cause to believe that the certificate

12

therein was falsified, he was authorized under the plain view doctrine to seize the certificate.

CONCLUSION

For these reasons, the military judge did not abuse her discretion in denying the motion to suppress the evidence.  The decision of the United States Army Court of Criminal Appeals is affirmed.